UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOAQUIN E. VILLATA SALZAR,<br><br>                              Plaintiff,<br><br>          v.<br><br>TIMOTHY ROBBINS ET AL,<br><br>                              Defendants. | Case No. 2:25-cv-05473-VBF-MAR<br><br>**AMENDED** MEMORANDUM AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER |

**I.**

**INTRODUCTION**

Before the Court is an ex parte application for a temporary restraining order ("TRO"), filed by Petitioner Joaquin E. Villata Salazar. ECF Docket No. ("Dkt.") 2. For the reasons discussed below, the Court **GRANTS** the application for a TRO.

**II.**

**BACKGROUND**

Petitioner alleges as follows:

Petitioner was previously detained by Immigration and Customs Enforcement ("ICE") from September 18, 2020 until February 3, 2022, when ICE released him on bond pursuant to Fraihat v. ICE, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2022). Dkt. 1 ("Pet.") ¶ 4. ICE determined that Petitioner had health conditions that placed him at heightened risk of severe illness and death if he contracted the COVID-19 virus.

1    Id., Ex. B.  Upon his release, ICE installed an ankle monitor and enrolled Petitioner in
2    the Intensive Supervision Appearance Program ("ISAP").  Id.
3         Petitioner reported to the ICE office in downtown Los Angeles for forty
4    consecutive months without issue, all while continuing to litigate his removal
5    proceedings.  Id. ¶¶ 6–7.  On February 3, 2025, the Board of Immigration Appeals
6    ("BIA") issued an order staying the removal while the BIA adjudicates Petitioner's
7    pending motion to reopen his application for asylum, withholding, and protection
8    under the Convention Against Torture.  Id.
9         On June 13, 2025, Petitioner received a message from ISAP instructing him to
10    report to the ICE office in Camarillo on June 14 or June 15.  Id. ¶ 8, Ex. E.  ISAP had
11    sent similar messages to dozens of noncitizens on June 6, resulting in their
12    incarceration when they appeared on June 7 and June 8.  Id. ¶ 9; Immigrants at ICE
13    check-ins detained, held in basement of federal building in Los Angeles, some
14    overnight, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-
15    at-icecheck-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/;
16    They followed the government's rules. ICE held them anyway, LAist (June 11, 2025),
17    https://laist.com/news/politics/ice-raids-los-angeles-family-detained.  Just like those
18    individuals, Petitioner was detained when he reported to the ICE office as instructed
19    on June 14, 2025.  Pet. ¶ 14.  ICE officers never articulated that Petitioner was a flight
20    risk, was a danger to his community, or had violated a condition of release—they only
21    told him that he was going to be detained because it is "what President Trump
22    wants."  Id.
23         Attempts to locate Petitioner were initially unsuccessful, but by 8:36 P.M. on
24    June 16, the Department of Homeland Security ("DHS") inmate locator stated
25    Petitioner's location is "TX 79934."  Id. ¶¶ 16–17, Ex. D.  The page directed family
26    members and legal representatives to contact the ICE office in Los Angeles.  Id.
27    Based on this information, Petitioner's counsel believes that Petitioner is in the
28    custody of the Los Angeles ICE office but may physically be located at the ICE

2

1  detention center in El Paso, where other individuals have been sent out of the country
2  within days of their arrival.  Id.; Dkt. 2-6, Declaration of Kari Hong ("Hong Decl.") ¶
3  12.
4        On June 16, 2025, Petitioner filed the instant ex parte application along with a
5  petition for writ of habeas corpus.  Dkt. 2.  Petitioner seeks an order "enjoining the
6  government from (1) continuing his unlawful custody, (2) prohibiting the government
7  to re-arrest him at any future time, unless and until he first receives a hearing before a
8  neutral adjudicator, as demanded by the Constitution; (3) prohibiting Respondents
9  from causing [him] to be removed or taken out of the United States, in violation of
10 the February 3, 2025 [BIA] Order and nation-wide injunction set forth in D.V.D. v.
11 U.S. Dep't of Homeland Sec., No. CV 25-10676-BEM, 2025 WL 1142968, at *19 (D.
12 Mass. Apr. 18, 2025).  Respondents filed an opposition on June 18, 2025.  Dkt. 9
13 ("Opp.").  The Court finds the motion for a TRO appropriate for resolution without
14 a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  Thus, the matter stands submitted.

## III.
## DISCUSSION

**A.   APPLICABLE LAW**

      Federal Rule of Civil Procedure 65 ("Rule 65") governs the issuance of temporary restraining orders and preliminary injunctions, and the same standards apply to both.  Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 & n.7 (9th Cir. 2001).  The primary purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction.  See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).  "So, despite important overlap, issuing a temporary restraining order is not designed to replace the 'thorough consideration contemplated by full proceedings pursuant to a preliminary injunction.'" MH v. Adams, No. 1:22-CV-00409-REP, 2024 WL 3237006, at *6 (D. Idaho June 29, 2024) (quoting Oby v. Clear Recon Corp., 2016 WL 3019455 at *1 (E.D. Cal. 2016)).

3

1  Notably, the Ninth Circuit has cautioned that there are very few circumstances
2  justifying the issuance of an ex parte temporary restraining order. Reno Air Racing
3  Assoc., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).

4       A party seeking emergency injunctive relief under Rule 65 must show "(1) that
5  he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in
6  the absence of preliminary relief, (3) that the balance of equities tips in his favor, and
7  (4) that an injunction is in the public interest." Toyo Tire Holdings Of Americas Inc.
8  v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 982 (9th Cir. 2010) (citing Winter, 555 U.S.
9  at 24). When seeking a temporary restraining order through an ex parte application, a
10 party must further show that he is without fault in creating the crisis necessitating the
11 bypass of regular motion procedures. See Mission Power Eng'g Co. v. Cont'l Gas
12 Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995). In addition, a party seeking the
13 issuance of an ex parte TRO must satisfy Rule 65(b), which requires a showing "that
14 immediate and irreparable injury, loss, or damage will result to the movant before the
15 adverse party can be heard in opposition" and certification of "efforts made to give
16 notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

17      The party seeking the injunction must present evidence sufficient to clearly
18 carry his burden of persuasion on each requirement. Towery v. Brewer, 672 F.3d 650,
19 657 (9th Cir. 2012) (citations omitted); see also Winter v. Nat. Res. Def. Council, Inc.,
20 555 U.S. 7, 20 (2008) (explaining that a preliminary injunction can issue only on "a
21 clear showing that the plaintiff is entitled to such relief"). The Ninth Circuit balances
22 these factors using a "sliding scale" approach, where "a stronger showing of one
23 element may offset a weaker showing of another," provided that the plaintiff still
24 makes a showing on all four prongs. All. for the Wild Rockies v. Cottrell, 632 F.3d
25 1127, 1131, 1135 (9th Cir. 2011). For example, "serious questions going to the merits'
26 and a balance of hardships that tips sharply towards the plaintiff can support issuance
27 of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood
28

of irreparable injury and that the injunction is in the public interest." Id. at 1135 (emphasis added).

**B.  DISCUSSION**

As an initial matter, the Court still finds that Petitioner has shown that they are without fault in creating the crisis that requires ex parte relief.  Petitioner was detained on Saturday, June 14, and counsel did not have any clue as to his whereabouts until Monday, June 16, when counsel learned that Petitioner may have been sent to the El Paso facility, where individuals have been removed from the country in a matter of days.  The instant Petition and Application were filed within twenty-four hours of this discovery.  It is clear that Petitioner and his counsel acted as quickly as possible in seeking relief after learning of the potential for his imminent removal.  In any case, the government has had an opportunity to file an opposition.  The Court proceeds to address the remaining Winter factors in brief.

**1.  Petitioner has shown "serious questions going to the merits"**

The Due Process Clause of the Fifth Amendment prohibits the Government from depriving individuals of their life, liberty, or property, without due process of law.  U.S. Const. amend. V.  In particular, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). "These protections 'appl[y] to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent,' and to immigration detention as well as criminal detention." Hernandez v. Sessions, 872 F.3d 976, 990 (9th Cir. 2017) (citing Zadvydas, 533 U.S. at 693).

"By statute, DHS 'at any time may revoke a bond or parole' issued pending a removal decision and then "rearrest the alien under the original warrant." Saravia v. Sessions, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) (quoting 8 U.S.C. § 1226(b)), aff'd sub nom. Saravia for A.H. v. Sessions, 905 F.3d 1137 (9th Cir. 2018). "But, notwithstanding the breadth of this statutory language, the [BIA] has recognized an

important implicit limitation on DHS's authority . . . that 'where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance'." Id. (quoting Matter of Sugay, 17 I. & N. Dec. 637, 640 (B.I.A. 1981)). In practice, DHS requires a showing of material change in circumstance, whether the prior bond determination was made by an immigration judge or a DHS officer. Id.; see also Panosyan v. Mayorkas, 854 F. App'x 787, 788 (9th Cir. 2021) ("Thus, absent changed circumstances … ICE cannot redetain Panosyan.").

Several courts in this circuit have relied on the limitation established in Matter of Sugay to recognize that the demands of due process require a pre-deprivation hearing before a noncitizen previously released from ICE custody is re-detained. See, e.g., Ortega v. Bonnar, 415 F. Supp. 3d 963, 968–70 (N.D. Cal. 2019) (granting habeas relief on due process claim, permanently enjoining the government from "re-arresting [the petitioner] unless and until a hearing, with adequate notice, is held in Immigration Court to determine whether his bond should be revoked or altered"); Vargas v. Jennings, No. 20-CV-5785-PJH, 2020 WL 5074312, at *3; (N.D. Cal. Aug. 23, 2020) ("In light of the persuasive reasoning of Ortega, and the ongoing litigation over the procedural due process claim granted by the court there, the court finds that petitioner has raised serious questions on the merits of his claim that he is entitled to a pre-deprivation hearing before an immigration judge if he is re-arrested."); Jorge M. F. v. Wilkinson, No. 21-CV-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (granting ex parte application for TRO, finding petitioner "has raised serious questions on the merits of his claim that he is entitled to a pre-deprivation hearing before an immigration judge if he is re-arrested"). In fact, in circumstances very similar to Petitioner's, a court in the Northern District recently found that a petitioner demonstrated a likelihood of success on the merits of a similar due process claim. See Enamorado v. Kaiser, No. 25-CV-04072-NW, 2025 WL 1382859, at *3 (N.D. Cal.

6

May 12, 2025) (issuing temporary injunction preventing the re-arrest of noncitizen at his ICE interview when he had been on bond for more than five years).

As noted above, Petitioner has been released for over three years, and there is no indication that Petitioner failed to comply with any conditions of his release or with any order issued to him by immigration authorities. And yet, Petitioner was apparently detained without hearing and without justification.

Respondents argue that Petitioner is unlikely to succeed on his due process claim because he was released primarily due to health concerns pursuant to the now-defunct injunction in Fraihat v. ICE, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2022). Opp. at 10–11. However, Respondents have not cited to any authority that this fact somehow lessens the established due process right to a hearing before the re-detention of an ICE detainee previously released from custody. Similarly, to the extent that Respondents argue that there has been a material change in circumstances that would justify Petitioner's re-detention, this does nothing to detract from Petitioner's right to address these allegations at a hearing before a neutral adjudicator.

Ultimately, given the weight of authority holding that due process requires that a noncitizen released from ICE custody must receive a hearing before being re-detained, the Court finds that Petitioner's allegations are sufficient to establish at least serious questions going toward the merits of his claim.

**2.    Petitioner is likely to suffer irreparable injury**

This factor weighs the strongest in Petitioner's favor. As noted above, counsel has inferred from the information available on the DHS website that Petitioner may have been transferred to a facility in El Paso where deportations have been occurring within a few days of arrival. Hong Decl. ¶ 12. Imminent and potentially permanent removal from the country is obviously one of the most irreparable injuries one could suffer, particularly where Petitioner is still in the process of litigating his deportation case. Indeed, courts have found even the mere potential for ICE detention without a hearing sufficiently irreparable as to justify the issuance of even an ex parte TRO. See

Enamorado, 2025 WL 1382859, at *2 (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)) ("Should Mr. Enamorado be detained, '[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'."); Jorge M. F., 2021 WL 783561, at *3 (quoting Hernandez, 872 F.3d at 995) ("The Court also finds that Petitioner-Plaintiff is likely to suffer immediate and irreparable harm unless the Court issues a TRO.  Absent injunctive relief, Petitioner-Plaintiff could be taken into ICE custody at any time and his bond would be cancelled . . . .  In addition to 'the irreparable harms imposed on anyone subject to immigration detention' that Petitioner-Plaintiff would suffer . . . his family faces the additional harms of severe economic hardship and psychological harm if Petitioner-Plaintiff is detained").

The government argues that Petitioner is not likely to suffer irreparable injury due to the fact that there is already a nationwide injunction in place that would prevent his deportation.  Opp. at 10.  However, even assuming Petitioner may not be subject to the threat of immediate removal, as noted above, several courts have found the potential for unlawful ICE detention alone to constitute irreparable harm.

**3.     The balance of equities and public interest factors favor Petitioner**

Where the government is the opposing party, the balancing of the equities and the public interest factors merge.  Nken v. Holder, 556 U.S. 418, 435 (2009).  In these cases, courts ask whether any significant "public consequences" would result from issuing the requested injunctive relief.  Monster Energy Co., 2020 WL 1652548, at *5 (citing Winter, 555 U.S. at 24).

Notably, "the government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."  Hernandez, 872 F.3d at 994.  Here, Petitioner was released from ICE custody for over three years, and yet was apparently re-detained

without justification or any explicit finding of a material change in circumstances. Absent such a finding, it appears that the government has no legitimate interest here.

Indeed, given that Petitioner has been released for over three years and has continuously complied with all directives from ICE, the Court cannot discern any significant public consequences that would result from his immediate release pending a hearing. To the extent that the government would argue that any hypothetical danger to the community or flight risk could constitute a significant public consequence, Petitioner was initially released, has never missed a previous check in, and even reported to the ICE office pursuant to this text at great risk of detention; these facts severely cut against any inference that his release on will carry any public consequence.

By contrast, Petitioner has a strong interest in being released immediately. First, for the past several months, Petitioner has been the sole caretaker for his cancer-stricken wife. Pet. ¶ 5. Additionally, and critically, counsel believes that Petitioner may have been transferred to a facility where deportations are occurring very quickly. Hong Decl. ¶ 12. It follows that any delay, even mere hours, may result in Petitioner's removal from the country, without any opportunity for the hearing to which he is entitled under the Constitution. Given all the potential consequences that Petitioner faces, and the government's comparatively small interest in keeping Petitioner detained without a hearing, the Court has no trouble concluding that the balance of equities and public interest weigh heavily in favor of Petitioner here.

## IV.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that Plaintiffs have made a sufficient showing on the four factors to warrant the imposition of a TRO. Indeed, even though "very few circumstances justify the issuance of an ex parte temporary restraining order," courts have issued similar TROs ex parte, in situations that were even less dire than Petitioner's. Enamorado, 2025 WL 1382859, at *2 (issuing

9

1 protective TRO preventing petitioner's re-arrest without a hearing, finding that even
2 the potential for re-detention justified ex parte relief); see also Jorge M. F, 2021 WL
3 783561 at *4 (same).  Given the potential irreparable harm to Petitioner, and the
4 comparatively small harm to the government, the Court finds that the allegations in
5 Petitioner's application warrant emergency injunctive relief.

6     **IT IS THEREFORE ORDERED THAT** Petitioner's motion for a TRO is
7 **GRANTED**.  The Court **ORDERS** that Respondents (1) release Petitioner from
8 custody; (2) refrain from re-arresting him unless and until he is afforded a hearing
9 before a neutral adjudicator on whether a change in custody is justified; and (3) refrain
10 from sending him to any place outside of the United States.

11     **IT IS FURTHER ORDERED** that the parties shall file supplemental
12 briefing on the issue of whether Defendants should not be preliminary enjoined from
13 re-detaining Petitioner without a hearing.  Defendant shall file an opposition by **July**
14 **9, 2025**.  Petitioner's Reply is due **July 16, 2025**.  These briefs may also address the
15 issue of a suitable bond under Rule 65(c).   The U.S. Attorney's Office SHALL SERVE
16 this Order on the U.S. Department of Homeland Security.

17 Dated:  June 18, 2025

*Valerie Baker Fairbank*

HONORABLE VALERIE BAKER FAIRBANK
United States District Judge

20 Presented by:

MARGO A. ROCCONI
United States Magistrate Judge

10